[S. C., infra, 234.]
On the 10th of September, 1784. Christopher Funkhouser, having a certificate of pre-emption issued by the commissioners, entered 640 acres of land with the entry taker of Davidson county, No. 347, in these words: "Christopher Funkhouser enters a preemption of 640 acres of land on Little Harpeth River, about two miles and a half below the south road that leads from the French lick, beginning one-quarter of a mile above his improvement, and half a mile on the east side of the river, and running west and south for quantity to include his spring and improvement." Afterwards a survey was made by Molloy, beginning at a red bud and hickory, supposed to be the southeast corner of Crocket's, then east 117 poles to a black oak, then south 33 poles, crossing Little Harpeth several times, to a sugar tree and hickory marked as a corner, thence west 312 poles to an elm, thence north 328 poles to a black oak and lynn, on said Crocket's south boundary line, and thence east 195 poles to the beginning. On the 15th of January, 1784. Ephraim Drake and Daniel Dunham, by virtue of a certificate of pre-emption, entered in the same office, No. 120, as assignees of John Drake, 640 *Page 184 
acres, "lying on Little Harpeth, near four and a half miles below the upper south road, at a spring breaking out of the bank of the creek, at a large sycamore tree, the spring to be as near the centre as may be, and to run at right angles for quantity." On the 11th of September, 1784, Cornelius Drake entered by virtue of a military warrant, No. 404, in the office of Martin Armstrong, number of the location 370, 571 acres, lying on the waters of Little Harpeth, "beginning at the south-east corner of Ephraim Drake's and Daniel Dunham's pre-emption, and running along their south side to their south-west corner, thence off at right angles for complement." On the 26th of October, 1789, White purchased the last mentioned warrant and entry from Cornelius Drake, who made a written transfer thereof to him, and, bound himself to convey to White when the patent should issue in his name. On the 21st of January, 1791, a survey was made on this entry: "571 acres, beginning on a red oak, thence south 268 poles to a large ash and hackberry, west 340 poles to a stake, north 218 poles to the south corner of Daniel Dunham's pre-emption, thence with his line west 340 poles to the beginning." A patent issued on this survey the 20th of May, 1808. The position of the survey is west of that made by Molloy for Funkhouser, leaving an interval between the western boundary of the latter and the eastern boundary of the former. On the 26th of September, 1786, Donelson made another survey for Funkhouser on the same entry of the latter on which Molloy had made his survey of 640 acres on both sides of Little Harpeth, "beginning at a red oak and dogwood on the north of said river, west 326 poles to a black oak and elm, south 320 poles crossing Little Harpeth to a buck eye and sugar tree, thence east 320 poles, crossing three branches to two elms and a red oak, north 320 poles, crossing Little Harpeth to the beginning." *Page 185 
This survey extended further north and west than Molloy's, including lands on the west side which were not within the bounds of his survey, which lands on the west side are a part of those included in Cornelius Drake's said survey, adjoining the eastern boundary thereof and are the lands now in controversy. A patent issues in this last survey of Funkhouser, dated the 30th of July, 1788, who conveyed to James Crocket, the defendant, the 27th of July, 1790. Before the grant issued to Cornelius Drake, Crocket commenced an action of ejectment against White, and recovered. White has not yet obtained a conveyance from Cornelius Drake. The position of these several surveys is established, and it is proved that the one made by Molloy was included by him in marked lines. It is proved that he made the survey upon Funkhouser's entry at the instance of James Crocket, who then had an entry on the north of it, who said to one of the witnesses it was an experimental survey; that he intended to purchase Funkhouser's tract; that he would endeavor to persuade him to agree to the survey as it was made by Molloy; that Funkhouser, hearing of the survey made by Molloy, was dissatisfied, and came to the settlement on Cumberland River and caused the survey to be made by Donelson, on which a patent issued. The survey of James Crocket was bounded on the south by Funkhouser's, as made by Molloy. The spring called for in Dunham's entry is described in the evidence so as to induce a belief that it is the same intended in his entry. It is not in the centre of the survey, but it is nearer to the south boundary than to the north, and rather nearer to the west boundary than to the east. The spring called for in Funkhouser's entry is identified; it is about two and a half miles below the south road. Ascending the river one-quarter of a mile leads to the eastern boundary of Funkhouser's survey; and going east from thence half a mile, there is the eastern boundary of *Page 186 
Molloy's survey. Running from thence to the cardinal points will exclude the spring: but go a small distance to the north from that point, and there begin and run to the cardinal points, and the spring will he included near to the north boundary. There are more than 640 acres in Funkhouser's last survey. The surplus, however, being on the south boundary will exclude but a small part of the land in controversy. When James Crocket caused a survey to be made on Funkhouser's entry, he had no authority, as he acknowledged himself, from Funkhouser. James Crocket purchased of Gillispie, who purchased of Funkhouser. The purchase by James Crocket was after the second survey. These are the material facts in the cause. If Funkhouser's last survey is to prevail, then White's bill is to be dismissed. If it vary from the entry, and that variation intrude upon Cornelius Drake's entry, then it is to be sustained.
This is a summary of the respective dates: Funkhouser's entry the 18th of March, 1784; Drake's entry the 11th September, 1784; James Crocket's entry the 7th June, 1784; Dunham's entry the 15th of January, 1784; Funkhouser's grant the 13th of July, 1788; Drake's grant the 20th of May, 1808. Is Dunham's survey and patent for the same land called for by his entry? for if it be not, then Cornelius Drake's entry, which is the land claimed by White, is not established at the place he claims. The spring is to be in the centre as nearly as may be. Had the survey been made in an oblong from east to west, the spring would have been nearly in the centre; making the survey afterwards in a square, and thereby throwing the spring more out of the centre, will not vitiate the entry which is dependent upon it; especially as this case is circumstanced, where the south boundary of Dunham will be nearly the same either way. Dunham's entry does not require a precise central position; that was decided in Henderson v. Long's Heirs, as reported in Haywood's *Page 187 
manuscript reports. The lick, which the entry directed to be in the centre of the survey, was as far from it as here, and yet the survey was deemed legal. Another remark is, that wherever the survey may be made, or whatever its form may be, the complainant's1 entry attaches to it. It can not be urged, by one whose survey extends beyond his entry, that the defendant's entry shall be placed on the boundary of a square, rather than of an oblong, or rice versa, for what is it to him? he can only be interested in the question by becoming a wrong doer himself, and an intruder upon lands which clearly do not belong to him. Wherefore is it material in this case for the assignee of Funkhouses to insist that the spring should be in the centre? is it not because he has transcended the limits of his own entry and got into foreign lands? will it be of any importance to him whenever he shall abandon the excess? let him only throw off the difference between 808 acres and 640 acres, and begin where he does, and he will have much to quarrel about with White. It is not settled what distance from the centre is too far from it, to answer the direction as near as may be. The preceding considerations relieve the Court from any further attention to the locality of Drake's survey or entry.
Then is Molloy's survey obligatory on Funkhouser? If we attend to the parol testimony, it was an experimental survey, made to show where James Crocket's south boundary should be, and was not intended to be one upon which Funkhouser's grant should issue. This testimony ought not to be received, for then a precedent would be established for impeaching surveys and for invalidating them by parol proof, which might eventually reach even those returned into the secretary's office, by proving that they were experimental and not such as grants should have issued upon. A survey is not provable at all unless it be returned into the secretary's *Page 188 
office, for, before that, it may be lost; not approved of by the principal surveyor; withdrawn and suppressed because of incorrectness, a wrong representation or description, or wrong locality, and, besides all this, may, by parol evidence, be placed here and everywhere; lines may be made, marked improperly and for mischievous purposes, and corners made also and established by the most deceptive testimony, to the ruin of those who are in a situation to be affected by misrepresentation. Why protect real estates from invasion when evidenced by entries and grants, and leave them exposed to be undermined by the most unsatisfactory testimony that can be conceived of? Has it not been often decided that a removed warrant, when a grant issues upon it, can not relate to the date of the survey? And why? Because there is no book to prove it, and parol testimony was too unsatisfactory to be resorted to. The person for whom made was not allowed to say, You knew of my survey before you obtained your grant, and I can prove it. Because parol proof was not admissible, such survey could not raise an equity in favor of him for whom it was made. The survey, in this instance, having not been sent to the office, and no grant having issued upon it, is not any estoppel to another survey. If others bounded themselves upon it, presuming that the position would be as described by the experimental survey, they are only in the same circumstances as where they run into an adjoining entry. There is no more hardship in the former case than in the latter. Molloy's survey must not be relied on.
Where then is the ground which should be occupied by Funkhouser's survey as directed by his entry, for that is the spot to which Drake may insist that he shall be confined? A survey ought to be made so as to include within its bounds a spring or other object, which the entry directs to be included, and if this can not be effected without a small deviation from other calls, that deviation should be made so far as is *Page 189 
indispensable to the accomplishment of this purpose; this is implied in the entry as strongly as if expressed, and whatever is inevitably implied is a part of it. Here is the spring; it must be included. The surveyor must go a quarter of a mile up the creek; he must then go half a mile, so as to lay the tract on both sides, for that was the design of this call; if a survey to the cardinal points, from the termination of that course and distance, will exclude the spring, he must go just so far to the north as will give a point from which a survey to the cardinal points will include it This is the description of the land contained in Molloy's survey, and is the land which the second survey should have comprehended. But the second survey has extended further to the north and west, and interfered with lands which belonged to Cornelius Drake's entry at the time the survey was made, and so far the grant issued upon it is unauthorized, as it takes lands to which White is entitled in equity. Decree that Drake's heir, made party by the amended bill, shall be divested of all title to the lands which he sold to White, and that the same shall be vested in White, his heirs and assigns. And further, that the lands in controversy between White and Crocket shall be divested out of Crocket, and vested in White, his heirs and assigns for ever, and that the costs of this suit be paid by Crocket.